Williamson *against* Jane Parisien, *alias dicta*, &c.

To entitle a party to sustain a bill for a *divorce*, under the statute, (sess. 36. ch. 102. 2. *N. R. L.* 197.,) he must be an actual and *bona fide* inhabitant of the state at the time of the adultery committed, and at the time of exhibiting the bill.

Where the plaintiff, a native of *Scotland*, married his wife in *New-York*, in 1780, and left her in 1784, and went to the *West Indies*, and continually resided abroad, excepting only a short visit to *New-York*, in 1792, until the time of filing his bill for a divorce, in 1813, a period of 28 years; it was held that he was not an inhabitant of the state, within the words or intent of the act.

Though an absence of five years, of one of the married parties, may exempt the other, who marries again, from the *penal* consequences of *bigamy*, under the provisions of the act, (1 *N. R. L.* 113.,) yet the second marriage is null and void ; for nothing but the death of one of the parties, or the judicial decree of a competent court, can dissolve the marriage tie.

THIS was a bill for a divorce, *a vinculo matrimonii*, filed by the husband against his wife, *January* 15. 1813, on the ground of adultery. The plaintiff stated, that in the year 1780, then being a resident in *New-York*, he married the defendant, then *Jane Lowndes*, an inhabitant of *New-York*, with whom he cohabited until the year 1784; and during their cohabitation had three children by her, two of whom are still living. That the plaintiff, being a mariner, in *June*, 1784, sailed from *New-York* for *Jamaica*, in the *West Indies*, and, from various causes and accidents, did not return to *New York* until 1792.

The bill charged that the defendant, in 1791, committed adultery with *Philip Parisien*, in *New-York*, with whom .

1815.

WILLIAMSON
v.
PARISIEN.

she pretended to have intermarried about that time, and still lived in adultery with him; and during such illicit intercourse with the said *Parisien*, has had six children by him, &c.

The *answer* of the defendant, filed *May* 13th, 1813, stated, that the defendant was married in the city of *New-York*, in 1780 ; that the plaintiff cohabited with her about three years, during which time she had two children by him, when he left her with child by him, which child was born a few weeks after his departure. That the plaintiff remained abroad eight years, settled in the island of *Jamaica*, acquired wealth, and lived there in a state of adultery, and had not, since his departure from *New-York*, in 1784, contributed in the slightest degree, to the support of the defendant, nor for the maintenance and education of her children. That she had, though struggling with great difficulties, by unwearied industry, maintained and brought up her children by him, one of whom died at the age of nine years. That the plaintiff took away her eldest son, at the age of 14 years. Concluding that the plaintiff had abandoned her for ever, or was dead, as was generally believed, she married *Parisien*, in 1792, with whom she had since lived in the marriage state, and by whom she had several children. That the plaintiff is a native and subject of *Great Britain*, having his residence in the island of *Jamaica*, where he has a house of trade, plantations, and slaves.

The cause was heard on the bill and answer, and an order of reference made, the 4th of *September*, 1813, to a master, to examine and report the truth of the facts set forth in the bill and answer.

On the 17th *January*, 1814, the master made a report of the evidence. The material facts proved are stated in the judgment of the court.

On the 12th of *October*, 1814, the cause came on, and was heard, *ex parte*, and a decree entered for the plaintiff; but, on petition of the defendant, an order was made, the

31st of *October*, for a rehearing. And the cause, accordingly, was brought on for a rehearing *January* 25th, 1815.

*Burr*, for the plaintiff.

*Van Vechten*, contra.

THE CHANCELLOR. The bill was filed the 15th of *January*, 1813, and the answer, among other things, states that the plaintiff " has his residence in the island of *Jamaica*, where he has a house of commerce, with other possessions, and slaves." Upon this bill and answer, a reference, upon the motion of the plaintiff, was made to a master, to in quire into the truth of the facts set forth in the bill and answer, and all questions arising thereon were reserved. Before, then, the question of adultery can be discussed, we must determine, from the facts stated in the report, whether the plaintiff had a residence within this state at the commencement of the suit, so as to entitle him to sustain the action. The statute concerning divorces is very explicit on this subject, that the injured party must be " *an actual resident* in this state at the time of the adultery being committed, and at the time of exhibiting the bill."

From the proof taken before the master, it appears, that the plaintiff is a native of *Scotland ;* that he came to *New-York* during the revolutionary war, and married the defendant in 1780 ; that, in *June*, 1784, he went to the *West-Indies*, and did not return to *New-York* until *June*, 1792 ; that, in the mean time, he was not heard of in his wife's family here, and it was generally supposed he was dead ; that he soon after returned to the *West-Indies*, though how soon does not certainly appear ; that, about 1797, a son of his, by the defendant, went to live with him in the *West-Indies ;* that, as to his second or last return to this state, it must have been very shortly before the filing of the bill, for one of the witnesses says he saw him, for the first time, about two months

before the 13th of *October*, 1813, but that he understood he had been here as long as nine months.   Another witness saw him since his last return only, about three or four months before *November*, 1813 ; and a third witness says, that she had not heard of the plaintiff since his first return, until within about a year from *November*, 1813.   These wit-nesses are all that speak on the subject of his last return to *New-York*, and as they were acquaintances, or connexions, of the parties, they were the persons who would, probably, acquire the earliest knowledge of his return.

Considering that the plaintiff had  continually resided abroad from *June*, 1784, down to near, or about, the time of the filing of the bill, (a period of above 28  years,) with the exception only of the short visit in 1792, I think here is a want of proof of residence in this state within the purview of the statute.   The fact of non-residence was put in issue by the answer, and it was the business of the plain-tiff to have furnished some direct and positive proof of the time of his return, and of the establishment of his residence here.   The fact was within his knowledge, and the omission to furnish the proof ought to turn every presumption against him.   His domicil was established abroad, and it is not changed by an arrival here for some temporary purpose, or on a transient visit.   The party suing for a divorce must have become an inhabitant, and taken up his residence here with a *bona fide* and permanent intent.   There must be the *animus manendi*, or a train of conduct and acts, showing an intended settlement here, before he can bring himself within the policy, as well as the language of the statute.

. The circumstances of this case are rather extraordinary. The plaintiff, after living with his wife for several years, and having children by her, abandons her while *enseint*, and goes abroad, and remains for eight years, without giving her either assistance or information.   She presumes him dead, and mar-ries again. ' He returns and discovers it, and, with apparent acquiescence, departs again for foreign parts, and continues

abroad for 20 years ; and he now, at this advanced period of    1815.

WILLIAMSON
v.
PARISIEN.

his life, returns and prosecutes his wife for adultery, arising
from the second marriage, after she has lived with her second
or assumed husband, with his knowledge and apparent acqui-
escence, for so many years, and reared up a family of chil-
dren.    The case, on his part, presents a cruel aspect, and I
feel no reluctance in being obliged to dismiss the bill ; yet
no conclusion must be drawn from this in favour of the
validity of the second marriage.    Though an absence for five
years, of one of the married parties, will exempt the other,
who marries again, from the penal consequences of bigamy,
yet the statute provision goes no further ; and, beyond all
doubt, the second marriage is null and void; no length of
absence, and nothing short of death, or the judicial decree
of some court, confessedly competent to the case, can dissolve
the marriage tie.    This is a principle, I may venture to say,
that pervades the laws of all the *Christian* nations of *Eu-*
*rope*.    (1 *Black. Com.* 440.    4 *Black. Com.* 163, 164.
*Pothier, Traite du Contrat de Marriage*, n. 437. 462—497.
*Ersk. Inst.* vol. 1. p. 109. 113.    *Barrington on the Statutes,*
401.    *Voet's Com. ad Pand.* lib. 23. tit. 2. *de ritu Nuptia-*
*rum*, s. 99.)

There were other objections suggested to this bill, arising
from the conduct of the plaintiff, and the lapse of time, which
I deem very important, but which I need not now discuss,
as I find sufficient reason for dismissing this bill simply on
the ground of a want of domicil here at the commencement
of the suit.

Bill dismissed, with costs.