BROWER *v*. BOWERS.

December, 1850.

A decree made upon a bill filed by a legatee in behalf of himself and all other legatees who might come in, &c., is not conclusive as against

such other legatees, being infants, as did not actually come in and be-come parties to the suit.

Consequently, the executor is still at liberty to contest the claim of such legatees, although it was declared established by the decree in that suit.

In the will of a testator, leaving nephews and grand nephews, a clause giving legacies to each of his nephews, excepting one person named, who, in fact, was a grand nephew, is to be construed, when consistent with other provisions of the will, as including grand nephews within the term nephews.

The circumstance that persons professing to be husband and wife, who emigrated hither from abroad, lived here in that relation for several years, and had children who were acknowledged as the issue of such a marriage, is sufficient evidence of a marriage, in fact, even though it may have the effect to invalidate a subsequent marriage.

Arguments from inconvenience are entitled to just weight in establishing rules of evidence.

A statute, remedial in its nature, and intended to legitimate the issue of marriages otherwise void, may properly be applied retrospectively.

Parol evidence cannot be received to show that by such a general term as nephews, the testator meant to include illegitimate nephews, unless it appears that there were no legitimate nephews, in which case the ambiguity would be explainable by parol evidence.

James Brower, general guardian of Valentine, Maria Elizabeth, and John, Kettleman, infant children of Valentine Kettleman, deceased; and Lewis Carpenter, and Mary, his wife; and Nicholas Cromer; and Jacob Ferris, general guardian of Mary Elizabeth Ferris, petitioned the surrogate of Queens county to compel Conrad Bowers, surviving executor of Peter Marks, deceased, to pay certain legacies claimed under the will of said Marks, with interest from the time they should have been paid; and upon being cited to appear and answer the petitioners' claims, Bowers denied that they were entitled to legacies under the will of the testator.

Upon the hearing before the surrogate there was read in evidence the will of said Marks, of which the fourth clause was: "I will and bequeath unto each of my nephews and nieces five hundred dollars, excepting John Cromer." The tenth clause was: "I will and bequeath unto the children of my nephew, John Cromer, five hundred dollars."

The testator left no issue, and his collateral relatives were as follows:

*Brother*—John Marks.

*Nephews and niece*—Catharine Emerson, George W. Marks and Martin Marks.

*Grand nephews and nieces*—

1. *Children of deceased nephews*—Nicholas Cromer, John Cromer and Anthony Cromer, and Mary, wife of one Carpenter; and Valentine, John and Mary Elizabeth Kettleman.

2. *Grandchild of a deceased nephew*—Mary Elizabeth Ferris.

The main question in this case was whether the grand nephews and nieces were entitled to take as nephews and nieces.

There was also read in evidence before the surrogate, a bill in chancery, before the vice-chancellor of the first circuit, by one Anthony Cromer, on behalf of himself and all other legatees of Peter Marks who might contribute to the expense of the suit, against Peter Pinckney and Conrad Bowers, executors, &c., of Peter Marks, deceased; praying that defendants be decreed to pay the legacies under the fourth clause of the will of Peter Marks, deceased; and also the answer thereto; and the decree by the vice-chancellor; and the affirmance by the chancellor; whereby it appeared that Nicholas Cromer, John and Anthony Cromer, and Mary, wife of Lewis Carpenter, were children of the testator's deceased nephew, Nicholas Cromer; that Mary Elizabeth Ferris was an only child of a deceased daughter of testator's deceased nephew, Nicholas Cromer; and that Valentine, John and Mary Elizabeth Kettleman were children of the testator's deceased nephew, Valentine Kettleman; and that they were all related to the testator in the same degree with John Cromer, a son of testator's deceased nephew, Nicholas Cromer, except Mary Elizabeth Ferris (whose mother was dead), who was related to the testator in the same degree with the children of John Cromer, provided for in the will. The decree of the vice-chancellor, affirmed by the chancellor (reported as Cromer *v.* Pinckney, 3 *Barb. Ch.* 466), was that complainants were included in the term "nephews and nieces," to whom legacies were given by clause 4 of said will of Peter

Marks, and were each entitled to five hundred dollars, which the executors were authorized to pay.

The executors' answer in the suit in chancery, set up solely the objection that these grand nephews and nieces were not nephews and nieces within the meaning of the will.

The Kettlemans, the present petitioners, did not come in as parties to the suit; but after the decree had been obtained, presented their petition to the surrogate as above stated. Conrad Bowers, the surviving executor, interposed the same objection to the petition that he had to the bill filed by Cromer, and also offered to show that the petitioners' father was an illegitimate son; and he objectes that the surrogate had no right to receive in evidence the record of the suit in chancery. The surrogate overruled the objection; and, upon proof of the identity of the parties claiming legacies with those named in the chancery proceedings and decree, the surrogate ordered the defendant to pay said legacies, with interest; and on defendant's appeal, the order was affirmed by the supreme court. Defendants appealed to this court.

*H. H. Burlock*, for defendant, appellant.—The rights of the wards of the respondent were not fixed by the decree of the vice-chancellor, and have not become *res adjudicata ;* as they had *no notice of the filing of the bill* in that case, and *were infants without a guardian.* 1 *Keene,* 391; 3 *Russell,* 130; 1 *Mylne & Keene,* 200; 1 *Barb. Ch.* 518. They were not parties to the suit, not having come in at any time during the pendency thereof; nor on the appeal. Foster *v.* Tyler, 7 *Paige,* 51; Gifford *v.* Hort, 1 *Sch. & Lef.* 409; Cromer *v.* Pinckney, 3 *Barb. Ch.* 466. The surrogate erred in decreeing the payment of the legacies claimed by the petition. *Dayton on Surrogates,* 172. The wards are not nephews and nieces of the testator, as there are other persons *in esse* answering the *description* in the will; and the will cannot be so construed as to let in any not within its terms. Fowle *v.* Kemp, 5 *Harr. & John.* 135; Gardner *v.* Heyer, 2 *Paige,* 11; Reeves *v.* Brymer, 4 *Vesey,* 697; 1 *Vesey Sr.* 196; Shelley *v.* Bryer, 1 *Jacob,* 207; Doughty *v.* Cutter, 23 *Wend.* 513; 7 *Hill,* 305. And as such a construction would let in great nephews and nieces to take equally with

their parents. Radcliffe v. Buckley, 10 *Vesey*, 195; Cutter v. Doughty, 7 *Hill*, 305.

*A. Thompson*, for plaintiff, respondent.—The rights of the respondents are fixed by the vice-chancellor's decree.   3 *Den.* 238; 4 *Paige*, 623; 5 *Id.* 132; 8 *Id.* 210.   The decree in chancery, as well as those appealed from, are according to the intent of the testator, and are well supported by decisions.   10 *Vesey*, 195; *Ambler*, 555, 603, 681; 1 *Jacob*, 207; 7 *Hill*, 305; 3 *Barb. Ch.* 466; 23 *Wend.* 522, 513; 4 *Vesey*, 431; 1 *Edw. Ch.* 354; 7 *Paige*, 328; 1 *Edw.* 41; 8 *Paige*, 375-6; 6 *Bro. C. C.* 125; 2 *Paige*, 11.

BY THE COURT.—HARRIS, J.—In 1845, Anthony Cromer filed a bill in chancery against the executors of Peter Marks, deceased, on behalf of himself and such other legatees as might choose to come in and contribute to the expense of the suit. The bill, after setting forth the will, states that the executors, though they had funds sufficient for that purpose, declined paying the legacies to which by the terms of the will the plaintiff and his brothers and sisters were severally entitled, without a decision of some competent tribunal declaring that they were entitled to such legacies.   The bill prayed that the executors might be decreed to pay to the plaintiff and to the other legatees their respective legacies.   The defendants, in their answer, stated that they had refused to pay the legacies on the ground that the plaintiff and his brothers and sisters were great-nephews and nieces of the testator, and therefore not within the description of persons named in the will, and that there was no other objection against the payment of the legacies.   In that suit the court made a decree, declaring that plaintiff and certain other persons therein named, among whom were the three infants, for whose benefit the proceedings in this case are taken, were each entitled to a legacy of five hundred dollars, under the fourth clause of the will of Peter Marks, they being nephews to whom legacies are given by said clause, and authorizing the payment of such legacies.

A question is now raised as to the effect of that decree.   Is it conclusive as to the rights of the legatees, or is the defendant,

as surviving executor, still at liberty to litigate those rights? On the one hand, it is insisted, that inasmuch as the bill, though filed by Anthony Cromer alone, was in fact filed for the benefit of all the legatees standing in the same relation with him, the matters in question in that suit have become *res adjudicata.* On the other hand, it is contended, that the infants represented by the plaintiff here, being in fact strangers to that suit, cannot now claim the benefit of the decree by way of estoppel against the defendant.

It is a general rule that the judgment of a court of competent jurisdiction, directly upon the point, is conclusive as between the same parties and their privies upon the same matter in the same or another court. 1 *Phil. Ev.* 321, 324. It is also a general principle that a transaction between two parties in judicial proceedings is not binding upon a third party. *Ib.* The reason is, that it would be unjust to bind any person who could not be permitted to make a defense or examine witnesses, or appeal from a judgment he might think erroneous. The converse of this proposition is also true. A judgment cannot be given in evidence against a party to a former suit by a stranger to that suit. "Nobody can take benefit by a verdict," says Baron GILBERT, "who had not been prejudiced by it had it gone contrary." *Gilb. Ev.* 28. See, also, Hursts *v.* McNiel, 1 *Wash. C. Ct.* 70. From these principles, the inference is very clear, that the defendant cannot be concluded by the decree in the former suit. The infants represented by the plaintiff in these proceedings were strangers to that suit. It does not even appear that they ever knew of its pendency. If the decree had been adverse to the plaintiff, it cannot be pretended that it would have estopped these parties from setting up their claim to legacies. If not, it follows that the defendant is not now estopped from denying their right. The estoppel must be mutual.

The question, therefore, whether these parties are entitled to legacies under the will, is still open for adjudication. What, then, was the intention of the testator, when in the fourth item of his will he said, "I will and bequeath unto each of my nephews and nieces five hundred dollars, excepting John Cromer?" For whom were these legacies designed? He had

already, in the third clause of his will, given to each of the children of his sister, Catharine, five hundred dollars. Besides these, there were living, at the time the testator made his will, one nephew and one niece, the children of the testator's brother. There were also living several grandchildren of the testator's sister, Elizabeth, one of whom was John Cromer. The question here is, whether these grandchildren of Elizabeth were intended to be embraced in the class of relatives described in the fourth clause of the will.

If the clause in question is to be construed according to the ordinary and primary meaning of the terms employed, it is obvious that these persons have no interest in its provisions. They are not in that sense nephews and nieces. But the testator had the right to define his own language, and if it can be seen from the context, taken in connection with the circumstances of his relatives, that by the terms nephews and nieces he intended some other persons than the children of his brothers and sisters, it is the duty of the court to give effect to that intention. The testator's sister, Catharine, had long before the time of making the will removed to Canada. The testator was probably not familiar with the situation of her family. He, therefore, by a separate provision in the will, gave to her children, if any, and as many as she might have, each a legacy of five hundred dollars. Besides these children he had but one nephew and one niece. It might well be supposed that he would, after having provided specifically for his sister's children, have made provision equally specific for these other persons standing in the same relation. Instead of this, we find him in general terms bequeathing legacies of five hundred dollars each to all his nephews and nieces, and with a single exception. That exception is John Cromer, who is not a nephew, but the son of a nephew. No one can suppose that the testator meant to give to the children of his sister, Catherine, double legacies; first, under the description of children of his sister, and then, under the general description of nephews and nieces. Nor, if he had intended to limit the effect of the fourth clause to the remaining nephew and niece, can it be supposed he would have in terms excepted John Cromer from the benefit of that provision. Why not except also the brothers and

sisters of John Cromer? From the fact that John Cromer is excepted, and that his brothers and sisters are not, is not the conclusion as irresistible, that the testator intended that the latter should receive legacies under the provisions of the fourth clause, as it is that the former should not? I am satisfied that the true construction of this clause of the will is, that the testator intended to give to each of the children of his brothers and sisters a legacy of five hundred dollars; that if any such child other than the children of Catharine, had died, leaving a child or children, every such child, with the exception of John Cromer, should be deemed to be a nephew or niece, within the meaning of the term as used in the fourth clause of the will, and that this principle should be applied to the descendants of his brothers and sisters in any degree. This view of the testator's intention is still further supported by the tenth clause of the will, which gives to the children of the testator's *nephew* John Cromer, collectively the same legacy to which he would have been entitled had he not been excluded from taking under the fourth clause. Adopting this construction, it follows that all the parties claiming legacies as the descendants of the testator's sister Elizabeth, are entitled to such legacies, unless the objection taken to the legitimacy of the three Kettleman childred is well founded. That question alone remains to be considered.

It appears from the evidence that Elizabeth, the grandmother of these children, was reputed to have been married to Anthony Cromer, in Germany. They lived together in this country several years and had several children. Cromer then abandoned his wife and went away. After he had been gone eight or nine years, she, not having heard from him, and supposing him dead, was married to Kettleman, by whom she had three children. After the death of Kettleman, Cromer returned, and it appears lived one winter with his wife and then left her again, and has not been heard of since. It is now contended that these facts establish the illegitimacy of the children of Elizabeth by Kettleman, and that these Kettleman children, being the descendants of that unlawful connection, are not entitled to take under the fourth clause of the will as the nephews and niece of Peter Marks.

It might, perhaps, be urged with some show of plausibility, in answer to this position, that upon a question of legitimacy, there is not sufficient evidence of the marriage of Elizabeth with the first husband Cromer; that when the effect of establishing the prior marriage is to bastardize the issue of the second marriage, higher proof should be required than mere cohabitation and reputation. But I am inclined to think that the fact that they came from Germany, professing to be husband and wife, that they lived together in that relation for several years, and had children who were acknowledged as the issue of such a marriage, is sufficient evidence of a marriage in fact, even though it may have the effect to invalidate a subsequent marriage. A very considerable portion of the population of our country is made up of European emigrants. Of these, a large proportion are married when they arrive here, and even when marriages are celebrated here, so migratory are the habits of the American people that in many cases it would be no easy thing to prove a marriage by those who witnessed the ceremony. It was well remarked by Ch. J. TILGMAN, in Chambers *v.* Dickson, 2 *Serg. & R.* 475, that, " in establishing rules of evidence, arguments from inconvenience have just weight. And that we must pay great attention to the situation of our own country, which is not in all instances adapted to regulations that are very proper in other countries."

Elizabeth, then, when she intermarried with Kettleman, was the lawful wife of Cromer, and, of course, the marriage was void. The children of such a marriage, both by the civil and common law, are illegitimate. Has this result been avoided in this case by the operation of statute? Section 6 of the statute, relating to marriage (2 *R. S.* 139), declares that if any person, whose husband or wife shall have absented himself or herself for the space of five successive years, without being known to such person to be living during that time, shall marry during the lifetime of such absent husband or wife, the marriage shall be void *only from the time that its nullity shall be pronounced by a court of competent authority.*

This statute took effect in 1830. Before that, although there was a statute exempting one married party who married again after five years' continued absence of the other from the penal

consequences•of bigamy, yet the second marriage was absolutely void. "No length of absence, and nothing short of death, or the judicial decree of some court, confessedly competent to the case, could dissolve the marriage tie." Williamson *v.* Parisien, 1 *Johns. Ch.* 389. Can this provision of the Revised Statutes be so construed as to legitimate the children of the second marriage? Did the legislature intend that it should be applicable to marriages that had previously taken place as well as to subsequent marriages? There can be no doubt that the marriage in question, had it taken place after the adoption of the Revised Statutes, would have been valid, until declared void upon the application of one of the parties to the marriage or the former husband. 2 *R. S.* 142, § 22. Suppose the parties had lived until the Revised Statutes took effect, and then one of them had sought, under the provisions of that statute, to annul the marriage, what would have been the decree of the court? Would it not. have been in conformity with section 6 of the statute, declaring the marriage void *only from the time the decree was pronounced?* I admit the soundness as well as the importance of the principle, that statutes are not to have a retrospective effect. "The very clear essence of a new law," said KENT, Ch. J., in Dash *v.* Van Cleeck, 7 *Johns.* 477, "is, that it is a rule for future cases. But," says the same learned jurist, "this doctrine is not understood to apply to remedial statutes, which may be of a retrospective nature, provided they do not impair contracts or. disturb absolute vested rights, and only go to confirm rights already existing, and in furtherance of the remedy, by curing defects and adding to the means of enforcing obligations. Such statutes have been held valid when clearly just and reasonable, even though they might operate in a degree upon existing rights; as a statute to confirm former marriages defectively celebrated, or a sale of lands defectively made or acknowledged." 1 *Kent Com.* 455. Suppose the legislature had seen fit, in 1830, to have passed a law in terms declaring the marriage between Kettleman and Mrs. Cromer to be valid, and the issue of that marriage to be legitimate until some competent court, upon the application of one of the parties, should pronounce it to be void, would the validity or wisdom of such a law be questioned? Had Peter Marks died before the pas-

sage of such an act, so that the rights of others in his estate had become vested, then, indeed, it would have been unjust, if not unconstitutional, to give it such a construction as might destroy rights which had actually attached. But in this case there were no vested rights to be affected by the statute at the time it was enacted. Peter Marks made his will and died long after the adoption of the Revised Statutes. Until those events happened, no one acquired any interest in his estate. No previously existing rights, therefore, would be affected by giving to this statute this retroactive operation.

A question quite analogous to that under consideration, came before the Virginia court of appeals, in Stones *v.* Keeling, 3 *Hen.* & *M.* 228, *n.* "The legislature of that State had, in 1785, passed a law declaring that the issue in marriage deemed null in law, shall, nevertheless, be legitimate." *Rev. Code Virg.* vol. 1, c. 93, § 19. This act took effect on January 1, 1787. Previous to the passage of the act, William Keeling had married Athalia Arbuckle, her first husband, William Arbuckle, being still alive. By this marriage he had two daughters. He had also a son, William Keeling, Jr., whose legitimacy was not disputed. The son died before his father, leaving a widow and children. Upon the death of the elder Keeling, the question arose, whether the daughters or the son's widow, to whom the guardianship of the children had been committed, was entitled to administration. For the daughters, it was contended that, by virtue of the act of 1785, they had become legitimate children, entitled to a share of the estate, and, as next of kin, were also entitled to administration. Upon the other side, it was insisted that the daughters having been born before the act was passed, they were not within its operation. It was held that the statute did apply to the daughters. TUCKER, J., said, " The father did not die till after the commencement of that act —the rights of the daughters to his property did not commence until his death. The question as between these parties did not, nor could it exist until that event, and then the act was in full operation." A similar question afterwards arose in the same court, upon another clause of the same section of the statute, which declares that, " where a man, having by a woman one or more children, shall afterwards marry such woman, such child

or children, if recognized by him, shall be thereby legitimated." Rice *v.* Efford, 3 *Hen. & M.* 225. Judge ROANE, in delivering the judgment of the court, after referring to the decision in Stones *v.* Keeling, said, " No objection to this construction can arise on the ground that the act invades private rights. At most, in the case before us, it is only a *possibility* of an interest that is invaded ; a possibility in relation to the children born in wedlock, depending upon their surviving their father and his dying intestate. This construction of the act, therefore, however it may be as to the inception of the right, is only prospective as to the consummation of it. It applies only to cases where the father has died posterior to the passage of the act."

A construction of the statute in question, which should have the effect to legitimate the issue of marriages of the description mentioned, though such marriage had taken place before the act was passed, would neither take away nor impair vested rights. Neither could it produce any injustice or inconvenience. The statute is remedial in its character. The revisers, in their notes, state, that their object in recommending this provision was to mitigate the severity of the common rule, which declared such marriages absolutely void. The other provisions of the title in which this section is found, are clearly applicable to all marriages prior as well as subsequent. I see no reason for a diversity of construction. I am, therefore, of opinion, that, by the operation of the section referred to, the marriage of the testator's sister, Elizabeth, to Kettleman, was rendered valid until it should be declared void by the decree of a court of competent authority ; and that thereby Valentine Kettleman, the issue of that marriage, and the father of these infants, was legitimated.

But for this statute, I should have had great difficulty in giving such a construction to the will as would entitle the Kettleman children to legacies under the fourth clause.

That the testator intended to include them in the class of persons described in that clause, and that he supposed he had done so, I have not for a moment doubted.

Valentine Kettleman, the father of these infants, is proved to have lived with the testator until he was married. He called the testator uncle, and the testator called both him and

15

the Cromers, nephews. It does not appear that he ever dreamed that there could be any question in respect to the validity of his sister's second marriage, or the legitimacy of the children of that marriage. And yet, if in fact the father of these children was illegitimate, I do not see how he or his children could, under the circumstances of this case, be allowed to take under the fourth clause of the will. It is true this was the testator's intention, and it has been well said, that in construing a will, " the intention of the testator is the polar star." But then it is a general rule, that when such general terms as children, sons, daughters, nephews, and nieces, are used, legitimate children only are intended. Illegitimate children may be made the objects of a testator's bounty; but to effect this, they must be clearly designated on the face of the will. Here, there are persons answering to the description in the will. The testator had nephews and nieces who were the legitimate descendants of his brothers and sisters. In such a case, parol evidence to show that by nephews and nieces the testator intended the illegitimate as well as the legitimate descendants of his brothers and sisters, is inadmissible. Had there been no such legitimate descendants, that fact would have created such a latent ambiguity as would have made it proper to resort to extrinsic evidence for the purpose of ascertaining who the testator intended by the general description of nephews and nieces. But, upon this branch of the case, there was no such ambiguity, and, therefore, parol evidence could not be received. I am inclined to think, therefore, that, but for the provision of the Revised Statutes already noticed, the real intention of the testator in respect to the Kettleman children must have been defeated. By the operation of that provision, unless I have entirely mistaken its effect, the father of these children became the legitimate nephew of the testator, and being such, and having died before the testator made his will, his children, by virtue of the enlarged sense in which the terms nephews and nieces are used in the fourth clause of the will, are entitled to legacies as the nephews and nieces of the testator. The decree of the supreme court should therefore be affirmed.

Decree affirmed, with costs.