JAMES GLASS *vs.* MARY GLASS.

A form of marriage entered into by the parties in good faith, and with a full but errone-
ous belief of the death of the woman's actual husband, is void, although he has been
absent and she has not known that he was alive for seven years; and may be declared
void, under Gen. Sts. *c.* 107, § 4, by a sentence of nullity, containing, however, as pro-
vided by Gen. Sts. *c.* 107, § 30, (in order to make children begotten before the com-
mencement of the suit the legitimate children of the father,) the statement that it was
contracted in good faith and with the full belief of the parties that the husband was dead.

LIBEL for a sentence of nullity of marriage, on the ground that
the libellee had another husband living at the time of the mar-
riage.

At the hearing, before *Wells*, J., the testimony for the libellant
tended to show that the libellee was married to William Hep-
burn, in the city of New York, August 28, 1854, she and Hep-
burn having shortly before come to this country from Perth, in
Scotland, where each had parents and other relations living;
that Hepburn and she lived together as man and wife in New
York City for about two months, when he shipped for a whaling
voyage; that he left her without money, and told her she must
provide for herself during his absence; that he arranged to send
letters to her in the care of one William Young, of New York;
that he did at various times send to her letters in that manner,
four or five in all, which were duly received by Young, the first
one of which Young delivered to her, but lost trace of her before
he received any of the others; that Hepburn sent no money to
her during his absence, and returned to New York about four
years after his departure; that he then inquired for his wife
among their mutual acquaintances, but learned no tidings of her;
that he remained in New York about eighteen months, and then
went to Easton, Mass., where he married in 1860, and has resided
ever since; that during the time he was in New York, and after-
wards, he communicated with his relatives in Perth, but made
no inquiry there about his wife; that the libellant and libellee
became acquainted with each other in 1861, and were married in
Boston in 1864; that the libellant also was a native of Perth,
and had relatives there, and among them a sister who for many

years had been the wife of a brother of the libellee. The libellant testified that at the time of his marriage with the libellee he was ignorant of the above facts concerning her relations with Hepburn.

The libellee's testimony agreed with the foregoing statements so far as related to her marriage with Hepburn, their living together in New York, and his departure on the whaler. She further testified that she received one letter from him before his vessel left the harbor, and another, written at sea some two months after his departure, the latter coming to her through the hands of Young; but that there had been no arrangement between her and Hepburn that letters should be forwarded to her in that way, nor did she know of any reason to expect other letters to be sent in the same manner; that being destitute, she worked for about three months in a rubber factory in New York, and then, on account of higher wages, went to Winchendon, Mass., and worked in a mill for about fifteen months, after which she went to Clinton, Mass., and worked in a factory there until her marriage with the libellant, except for a few months in 1861, when she made a visit to her relatives in Perth; that when she left New York she did not inform any of her acquaintances there where she was going, nor did she ever write to them afterwards, but she did several times a year write to and receive letters from her relatives in Perth, and kept them informed of her whereabouts, and through them endeavored to get tidings of Hepburn, and when she was in Perth, in 1861, she endeavored, without success, to ascertain if he was still living; that after the receipt of the second letter above mentioned, she never heard from Hepburn or about him, or heard anything to lead her to think him living, and she did actually suppose him to be dead until he appeared before her at the trial as a witness for the libellant; that all these matters were told by her to the libellant before their marriage, and he professed to be satisfied that Hepburn was dead, and expressed himself willing to assume whatever risk there might be.

On cross-examination, she testified that when her husband, Hepburn, left her, he was to return in three or four years, and

she expected him back in that time ; that when she left New York, three or four months after his going away, she had no intention to go back to New York and meet him on his return there, but expected him to seek her out ; that she never made any inquiries afterwards for him in New York ; that she personally made no inquiries of his friends in Scotland or elsewhere concerning him ; that she never heard of his death, and had no reason to suppose him dead other than not hearing from him, and that it was agreed between them, when he went away, that she should take care of herself until his return.

The presiding justice ruled that the libellant was entitled to a decree of nullity, as a matter of law, upon the foregoing evidence, but at the libellee's request reported the case for the determination of the full court.

*C. W. Turner*, for the libellant.

*E. Davis*, for the libellee.

GRAY, C. J.   By the Gen. Sts. *c.* 106, § 4, " all marriages contracted while either of the parties has a former wife or husband living, except as is provided in chapter one hundred and seven, shall be void."   By *c.* 107, § 1, all marriages solemnized in this state, which are prohibited by law on account of either party having a former wife or husband then living, " shall be void without any decree of divorce or other legal process."   By § 4, when a marriage is supposed to be void, or the validity thereof is doubted, for any cause, either party may file a libel for annulling the same, and upon proof of any cause of nullity, " the marriage shall be declared void by a sentence of divorce or nullity."   And by § 30, " when a marriage is dissolved on account of a prior marriage of either party, and it appears that the second marriage was contracted in good faith, and with the full belief of the parties that the former husband or wife was dead, that fact shall be stated in the decree of divorce or nullity ; and the issue of the second marriage, born or begotten before the commencement of the suit, shall be deemed to be the legitimate issue of the parent capable of contracting the marriage."   Chapter 107 contains no other provision applicable to this case.

It must be assumed, upon the report of this case, that the second marriage was contracted by both parties in good faith, and with the full belief that the respondent's former husband was dead. As he had been absent for seven years, they might not be guilty of polygamy. Gen. Sts. *c.* 165, §§ 4, 5. But as he was in fact still living, and the first marriage had not been dissolved by a decree of divorce, the respondent was in law his wife, her second marriage was unlawful, and the information which both parties to it had of the former marriage, and of the circumstances connected with the absence of the former husband, cannot estop either to apply to the court for a decree of nullity. *Miles* v. *Chilton,* 1 Rob. Eccl. 684. *Williamson* v. *Parisien,* 1 Johns. Ch. 389. *Zule* v. *Zule,* Saxton, 96. *Kenley* v. *Kenley,* 2 Yeates, 207. *Janes* v. *Janes,* 5 Blackf. 141. *Martin* v. *Martin,* 22 Ala. 86.

A decree of nullity must therefore be entered, containing, however, according to the provision of the Gen. Sts. *c.* 107, § 30, a statement that the second marriage was contracted in good faith, and with the belief that the former husband was dead, in order that the issue of this marriage may be secured in their rights as the legitimate issue of their father. *Decree accordingly.*